UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ANTHONY RUCKER,

                              Plaintiff,                    Case # 18-CV-6575-FPG

v.

                                                                   DECISION AND ORDER

DR. FLETCHER, et al.,

                              Defendants.
_____

## INTRODUCTION

*Pro se* Plaintiff Anthony Rucker, a prisoner incarcerated at Mohawk Correctional Facility, brings this civil rights action under 42 U.S.C. § 1983, alleging that Defendants denied him adequate medical treatment during his pretrial confinement at the Monroe County Jail. Plaintiff filed his original Complaint on August 10, 2018, ECF No. 1, and filed the operative Second Amended Complaint (the "SAC") on November 5, 2021. ECF No. 68.

On January 10, 2022, Defendants filed a motion to dismiss the SAC. ECF No. 40. Plaintiff responded in opposition, ECF No. 81, and the Defendants replied, ECF No. 82. For the reasons set forth below, Defendants motion is GRANTED IN PART and DENIED IN PART.

## PROCEDURAL HISTORY

Plaintiff commenced this action on August 10, 2018 with the filing of his initial Complaint and a motion to proceed *in forma pauperis*. ECF No. 1; ECF No. 2. His Complaint named the following individuals as Defendants: Dr. Fletcher, Nurse Griffen, Nurse Scott, Nurse Smith, Nurse Rush, Nurse Hamm, Nurse Holden, Nurse Wirth, Nurse Houri (sometimes spelled "Khouri"), Deputy Scarpulla, Deputy Deep, Deputy Shalts, Deputy Whitehair, Deputy Minnus, Deputy Caubisie, Deputy Casalo, Deputy Frado, Deputy Bailil, Deputy Noble, and Deputy Smithil.

On October 22, 2018, the Court issued a Decision and Order in which it granted Plaintiff's *in forma pauperis* motion and screened Plaintiff's Complaint pursuant to 28 U.S.C. §§ 1915(e)

and 1915A.  ECF No. 6.  In that Order, the Court dismissed without prejudice Plaintiff's claims against the "Deputy Defendants" (those who were deputies at the Monroe County Jail during the events in question).  *Id.* at 9-10.  The Court found that Plaintiff had adequately stated claims against the remaining Defendants.  *Id.* at 10.

After the Court granted Plaintiff additional time to file an amended complaint, Plaintiff filed his First Amended Complaint (the "FAC") on February 6, 2019.  ECF No. 13.  In a Decision and Order dated June 3, 2019, this Court screened the FAC pursuant to 28 U.S.C. §§ 1915(e) and 1915A.  ECF No. 14.  In that Order the Court again dismissed the claims against the Deputy Defendants, this time with prejudice, and they were subsequently terminated from this action.  ECF No. 14 at 5.  The Court also ruled that the case could proceed "against each Defendant doctor and nurse." *Id.* at 5.

On November 26, 2019, Defendants Fletcher, Griffen, Hamm, Holden, Houri, Rush, Scott, Smith, and Wirth filed a motion to dismiss the FAC for failure to state a claim.  ECF No. 40.  On April 8, 2020, the Court granted Defendants' motion on the grounds that Plaintiff failed to exhaust his administrative remedies.  ECF No. 50 at 1.  Thus, the Court did not "reach[ ] the question of whether Plaintiff adequately stated a deliberate indifference claim against Defendants."  *Id.*  Thereafter, the Clerk of Court entered judgment in favor of Defendants Fletcher, Griffen, Hamm, Holden, Houri, Rush, Scott, Smith, and Wirth and closed the case.  ECF No. 51.

On April 20, 2020, Plaintiff filed a Notice of Appeal.  ECF No. 54.  On June 14, 2021, the Second Circuit reversed this Court's judgment regarding administrative exhaustion and remanded the case for consideration of Plaintiff's claims on the merits.  ECF No. 59 at 1.  After holding a status conference with the parties, the Court issued a Decision and Order on August 12, 2021, ruling on the merits arguments raised in Defendants' motion to dismiss.  ECF No. 63.  In that

Order, the Court granted Defendants' motion to dismiss Plaintiff's claims and dismissed the FAC. ECF No. 63 at 4-13. With respect to Scott, Griffen, and Smith, the Court noted that these Defendants "do not appear at all in Plaintiff's [FAC]" nor "do they appear in the medical records incorporated in Plaintiff's [FAC]." *Id.* at 5. Thus, the Court dismissed the claims against these Defendants on the basis that personal involvement was not established, as required under 42 U.S.C. § 1983. *Id.*

Regarding the remaining Defendants—Fletcher, Houri, Rush, Hamm, Holden, and Wirth—the Court analyzed Plaintiff's allegations, and the relevant medical records, as to each and concluded Plaintiff had not sufficiently alleged a claim of deliberate indifference as to any Defendant. *Id.* at 7-11. Despite finding no viable claims and ordering the FAC dismissed, the Court granted Plaintiff 45 days to file a second amended complaint. *Id.* at 12-13.

After affording Plaintiff several extensions of time, including a *nunc pro tunc* extension, the Court deemed timely Plaintiff's SAC which was filed on November 5, 2021. ECF No. 69; ECF No. 72. On January 10, 2022, after being afforded additional time, Defendants moved to dismiss the SAC for failure to state a claim. ECF No. 76. That motion is now fully briefed and is presently before the Court.

**FACTUAL BACKGROUND**

For purposes of deciding Defendants' motion to dismiss, the Court assumes the allegations in Plaintiff's SAC are true and draws all reasonable inferences in his favor. *See Rodriguez v. Corizon Health Care*, No. 15 Civ. 5251, 2016 WL 3189960, at *1 (S.D.N.Y. June 6, 2016) (citing *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014))

3

Plaintiff's SAC asserts that on "Day 1"[1] of the events at issue, he woke up in the Monroe County Jail experiencing dizziness, nausea, difficulty breathing, dehydration, and blurry vision. ECF No. 69 at 1. Plaintiff informed a jail deputy of his "weakness" and was instructed to wait for the nurse to perform the morning "med pass." *Id.*

During the morning med pass, Plaintiff advised Nurse Rush "of his weakness" and requested to see Dr. Fletcher. *Id.* Nurse Rush proceeded to call Dr. Fetcher on the phone, and she "advised [him] that the Plaintiff really needed to see him." *Id.* In response, Dr. Fletcher stated that "if the Plaintiff was not bleeding and not dying that he would be fine." *Id.*

Later that day, during the afternoon med pass, Plaintiff again informed Nurse Rush "of the same weakness." ECF No. 69 at 1. Nurse Rush responded that if Plaintiff "was not dying or not bleeding that she will not call the Docter [sic]." She made this statement despite the fact that, according to Plaintiff, "it was clear that something was very wrong with [him]." *Id.* Nurse Rush left the encounter with Plaintiff without calling Dr. Fletcher. *Id.*

During the day's evening med pass, Plaintiff was seen by Nurse Smith. *Id.* He informed Nurse Smith "of his weakness" and she too "denied the chance to see the Docter [sic]," explaining that "the Dr. told her if [Plaintiff] was not bleeding or dying that [he] would be good." *Id.*

At some point in time during that first day of his symptoms, Plaintiff telephoned "his kids [sic] mother" and told her that "he could not breath and that he felt like he was dying." *Id.* Plaintiff asserts that, by that point, he "could not walk or stand up straight." ECF No. 69 at 1.

---

[1] Plaintiff alleges that Day 1, Day 2, Day 3, Day 4, Day 5 of his symptoms, and the facts at issue, occurred "on or about June 10th or June 14th 2017." Based upon this, the Court understands Plaintiff to be alleging that June 10, 2017 was "Day 1," June 11, 2017, was "Day 2," and so on through June 14, 2017 which was "Day 5." Because the exact dates are unclear, the Court has used the nomenclature found in Plaintiff's allegations.

Indeed, Plaintiff acknowledges in his reply brief that he is unable to give exact dates and times because he "was sick beyond anything he evr [sic] felt in life." ECF No. 81 at 2. However, he estimates that he was sick for "4 to 11 days" before ultimately being treated. ECF No. 81.

4

On "Day 2," Plaintiff woke up in "exstream [sic] pain in his stomach" and was unable to eat or drink.  *Id.* at 2.  He also felt dizzy, nauseous, dehydrated, was having difficulty breathing, and was experiencing blurry vision.  *Id.*  During the morning med pass on Day 2, he informed Nurse Scott that he needed to see a Doctor "because he felt like he was dying."  *Id.*  In response, Nurse Scott said "that there was nothing [she] could do for hin [sic] that it was Dr. Fletchers [sic] decision and Dr. Fletcher did not want to see him."  *Id.*  Plaintiff received the same response from Nurse Lewis during the afternoon med pass when he again asked to see a Doctor.[2]  ECF No. 69 at 2.

On "Day 3," Plaintiff again woke up with extreme stomach pain, again could not eat or drink, "still had troble [sic] standing up, because the dizziness," and was still experiencing nausea, difficulty breathing, dehydration, and blurry vision.  *Id.*  On that day, Plaintiff "advised the deputy working and the nurses on the morning, afternoon and the evening med pass, but was still denied to see the inside Docter [sic]."  *Id.*  Plaintiff alleges that his fellow inmates had taken notice of his condition and had also reported it to a deputy and to nurses.  *Id.*

On "Day 4," Plaintiff woke up having barely slept the night before.  He "was very weak and could not stand or walk or talk."  *Id.* at 3.  As happened on Day 3, other inmates took note of Plaintiff's condition and "advised the deputy and all the nurses that came around on the med passes about the Plaintiff [sic] illness that the Plaintiff was having at that time."  ECF No. 69 at 3.  Plaintiff asserts that he "received the same treatment" on Day 4 as on the previous days: he "was not allowed to see the Doctor by the nurses and the deputys [sic] working."  *Id.*

---

[2] Nurse Lewis has not been named as a Defendant in this action and has never appeared in this case.

Plaintiff alleges that on "Day 5" he "woke up with the same problems" but his symptoms were worse than the preceding days. *Id.* He raised his concerns with "the nurses" again but "does not remember whice [sic] days that each nurse worked" or the exact dates and times. *Id.*

On "Day 6" of Plaintiff's symptoms, he awoke "felling worst [sic] then [sic] the day befor [sic], more weaker, and could barly [sic] breath [sic], stand or walk, or move at all." *Id.* at 4. Plaintiff alleges that he could only stand up for "3 seconds" without feeling faint or passing out. *Id.* Plaintiff "begged" to see a Doctor and several Monroe County jail deputies saw him as he lay in this state "dying slowly . . . on the cell floor." ECF No. 69 at 4. Plaintiff alleges that these deputies observed Plaintiff "unable to walk, eat, drink, [or] stand," and barely able to talk. *Id.* He further alleges that he "laid on the floor with throw up, urine, and feces all over his person for three days" but that deputies did not raise any concerns with medical staff.[3] *Id.*

On June 21, 2017,[4] Plaintiff was still experiencing the same symptoms but was "only" administered an "asthma pump" and his request to see a doctor was again denied. *Id.* at 8. That evening, Plaintiff "refused to lock in at the 9:30pm count time" and the deputy on duty contacted a sergeant to inform him that Plaintiff had refused to "lock in" due to his illness. *Id.* The sergeant, in turn, contacted Dr. Fletcher. ECF No. 69 at 8. Plaintiff informed Dr. Fletcher that "he felt like he was dying" and that his symptoms "had nothing to do with his asthma." *Id.* In response, Dr. Fletcher told Plaintiff that he did not see anything wrong "at all," gave Plaintiff "another NEP

---

[3] It is unclear from the factual allegations in the SAC which three-day period Plaintiff is alleging that he laid on the floor covered in vomit, urine, and feces but the allegations are made during the portion of the SAC in which Plaintiff discusses his symptoms on Day 6.

[4] It is unclear to the Court from Plaintiff's SAC whether "Day 6" is June 15, 2017, June 20, 2017, or some other date. Assuming it is June 15, 2017, and following sequentially from "Day 1" on June 10, 2017, there appears to be a period of several days where Plaintiff does not make specific allegations. Regardless, Plaintiff does allege that "on or about June 10 throw [sic] June 21, 2017," he felt progressively worse each day. *See id.* at 4.

6

treatment" for asthma and placed him in a medical observation cell.  *Id.*  He denied Plaintiff's request to be examined by an "outside" doctor.  *Id.*

The next day, on June 22, 2017, Plaintiff alleges that he woke up on the floor of his cell and could not move or stand.  *Id.*  The doctor gave him a pill for nausea but it did not work.  *Id.*  Plaintiff alleges that he "still could not keep food or liquid down," "could not make it to the bathroom by him self [sic]," and, by that point, had vomited and "used the bathroom on him self [sic] for three days."  ECF No. 69 at 8.  Plaintiff cried to the nurses and doctors because he wanted to go to the hospital.  *Id.*  Dr. Fletcher examined Plaintiff's tongue and noted that it "was white as paper because of dehydration."  *Id.*

On the following day, June 23, 2017, Plaintiff continued to lie on the floor and "begged" the "nurses" and Dr. Fletcher to be taken to a hospital.  *Id.* at 9.  Plaintiff "could not eat or drink as the rest of the days."  *Id.*  That night, nurses and deputies responded to a "code blue" on the same floor as Plaintiff and Plaintiff "call[ed] out weakly with other inmates that the Plaintiff needed a cold [sic] blue as well."  *Id.*  A sergeant and nurses came to Plaintiff's cell and took his vitals.  *Id.*  A nurse was unable to obtain Plaintiff's pulse manually or by using an oxygen machine.  *Id.*  By that time, Plaintiff was "in and out" of consciousness.  ECF No. 69 at 9.  Plaintiff does not recall, but later learned, that he was thereafter hooked up to an IV and transported to the hospital.  *Id.*

Plaintiff was admitted to the hospital for diabetic ketoacidosis, peritonitis, portal venous gas, and pneumobilia on June 24, 2017.  *Id.*  He alleges that he underwent an exploratory laparotomy and small bowel resection that same day.  *Id.*  Doctors removed "200 CM of [Plaintiff's] intestine" during surgery.  *Id.*  He further alleges that his doctor at the hospital told his

mother and brother that he "only had a 10% chance of living with or with out [sic] the surgery." *Id.*

On June 25, 2017, Plaintiff underwent a "re-exploration resection" and "had to be induced into a coma in order to have the procedure done". ECF No. 69 at 9. Plaintiff was thereafter transferred to an intensive care unit for "further management." *Id.* He was outfitted with a nasogastric tube and underwent other additional treatments. *Id.* Plaintiff was diagnosed with diabetes mellitus and "short gut syndrome." *Id.* His pancreas became infected which ultimately necessitated its removal. *Id.*

As a result of Plaintiff's illness and subsequent procedures, he "takes insulin to control his blood sugars"; eats a special "diabetes diet"; "will have diarrhea for the rest of his life"; requires "over 15 pills a day"; has large surgical scars; and must use the bathroom shortly after eating. ECF No. 69 at 9-10. Plaintiff alleges that, due to "the lack of medical attention" by the Defendants and the "deni[al] [of] proper medical attention in the Monroe County Jail for over a week," he is a "[whole] different person all the way around." *Id.* at 10. He alleges that he was not provided medical care in a timely manner despite "begg[ing] . . . the . . . medical staff for help for days on end." *Id.*

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides that a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007), and "draw all reasonable inferences in Plaintiff's favor." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The application of this standard is "a context-specific task that requires the reviewing court to draw out on its judicial experience and common sense." *Id.* at 679.

It is well established that the submissions of a pro se litigant must be construed liberally and interpreted "to raise the strongest arguments that they suggest." *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (quoting *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006)). "[D]ismissal of a pro se complaint is nevertheless appropriate where a plaintiff has clearly failed to meet minimum pleading requirements." *Rahman v. Schriro*, 22 F. Supp. 3d 305, 310 (S.D.N.Y. 2014) (citing *Rodriguez v. Weprin*, 116 F.3d 62, 65 (2d Cir. 1997)).

**DISCUSSION**

**I.   Consideration of Medical Records**

As a threshold matter, the Court notes that Plaintiff's SAC did not include as an attachment certain medical records that the Court considered in its ruling dismissing the FAC. *Compare* ECF No. 69 *with* ECF No. 13. Defendants, citing *McDowell Research Corp. v. Tactical Support Equip., Inc.*, 2009 U.S. Dist LEXIS 80884, *6 (W.D.N.Y. 2009), urge that these records should nonetheless be considered because the Plaintiff relied upon them in bringing suit and they are either in Plaintiff's possession or he knew about them when bringing suit. ECF No. 76-6 at 11-12. They further argue that the Court should credit the medical records over the allegations in Plaintiff's SAC to the extent they are contradictory. *Id.* at 17.

9

In response, Plaintiff indicates that he was unaware that he had to resubmit the attachments to the FAC, *i.e.* the medical records, as he "thought only the writing part" needed to be resubmitted to amend the FAC. ECF No. 81 at 3. Had he understood this, he "defaintly [sic] would have resubmitted the medical records." *Id.* So, in this sense, Plaintiff does not dispute that the Court may properly consider the medical records. However, Plaintiff also argues that "the Court should not credit the medical records over the Plaintiff [sic] allegations, because the Defendants lacked to produce all of the medical records from June 10 – June 23, 2017." *Id.* at 5.

Though the Court previously relied upon Plaintiff's medical records in its review of the FAC, it declines to do so at this juncture for several reasons. First, though Plaintiff attached the records to the FAC, and indicates that his failure to attach them to the SAC was inadvertent, the allegations in the SAC recount Plaintiff's version of the events and do not reference or quote the medical records. Nor do they tell the story of the events through a reading of the medical records. Because of this, it cannot be said that the medical records are "integral" to Plaintiff's SAC. *See Hamilton v. Westchester Dep't of Corrections*, No. 19-CV-3838, 2020 WL 4271709, at *3 (S.D.N.Y. July 23, 2020) (finding medical records were not "integral" to the complaint where the plaintiff "did not necessarily rel[y] heavily on the [medical] records in drafting the . . . Complaint, nor did he explicitly quote[ ] language from various documents in the record." (alterations in original) (citations & internal quotation marks omitted)). '

Second, this Court must be vigilant to avoid the inappropriate resolution of "questions of fact" because, to the extent the medical records Defendants now proffer contradict the allegations in the SAC, they represent "only the defendants' version of the events." *Stinson v. City of New York*, No. 18-CV-0027, 2021 WL 3438284, at *16 (S.D.N.Y. July 6, 2021); *see also Hamilton*, 2020 WL 4271709, at *4 ("Given that [Defendant] proffers the medical records because they, at

least to some extent, contradict Plaintiff's factual allegations in his Complaint, considering the records and using them to grant Defendants' Motions would require the Court to engage in improper fact-finding at the pleading stage of the Action.").

The Court agrees with Plaintiff's argument that considering the medical records is problematic because they may not represent a full set of the records of Plaintiff's treatment during the time period in question. Indeed, there has been no representation by Defendants that the records submitted are a complete set of all medical records related to Plaintiff's care and treatment during the relevant time. Discovery has not taken place in this action and Plaintiff is navigating this case as a *pro se* litigant.

Finally, the Court has considered whether converting Defendants' motion to dismiss to one for summary judgment would be appropriate and declines to do so. While Defendants attached this District's "Important Notice to Pro Se Litigants" regarding Rule 56 Motions for Summary Judgment to their motion to dismiss, likely in an effort to be provide the requisite notice to Plaintiff should this Court convert their motion, the Court cannot be sure that Plaintiff has in his possession the relevant evidence needed to refute such a motion. *See Alderman v. 21 Club Inc.*, 733 F. Supp. 2d 461, 466 (S.D.N.Y. 2010).

Accordingly, for all the reasons set forth above, the Court declines to consider the medical records which Defendants have submitted and will evaluate Plaintiff's claims based upon the allegations in the SAC.[5] *See Nielson v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) (summary order)

---

[5] The "law of the case" doctrine and the Court's prior consideration of the medical records in conjunction with the FAC does not foreclose this ruling. That doctrine is "not a rule that bars courts from reconsidering prior rulings, but is rather a discretionary rule of practice [that] generally does not limit a court's power to reconsider an issue." *Colvin v. Keen*, 900 F.3d 63, 68 (2d Cir. 2015) (alterations in original) (internal quotation marks & citation omitted). Thus, the doctrine "does not rigidly bind a court to its former decisions, but is only addressed to its good sense." *Id.* (citation & internal quotation marks omitted).

Moreover, any potential prejudice to Defendants due to the change in ruling regarding the Court's consideration of the medical records is outweighed by the potential prejudice to Plaintiff that would result from considering records

(finding the district court erred in relying on medical records proffered by the defendants where doing so required the court to resolve issues of fact).

## II. Plaintiff's Claims

### A. Deputy Defendants

Though Plaintiff does not name them in the caption, *see* ECF No. 69 at 1, the SAC includes factual allegations regarding various deputies at the Monroe County Jail who allegedly observed Plaintiff in need of medical assistance and took no action. *See, e.g.*, *id.* at 4. However, as the Court advised Plaintiff in its August 12, 2021 Decision and Order, the Deputy Defendants were dismissed with prejudice pursuant to this Court's June 3, 2019 Order. *See* ECF No. 63 at 13. The Court further advised Plaintiff that any second amended complaint "is to be limited to his alleged deliberate indifference claim against prison nurse and doctors." *Id.* Accordingly, to the extent it is Plaintiff's intent to revive his claims against the Deputy Defendants, such claims were previously dismissed with prejudice and are not viable in the SAC.

### B. Defendants Hamm and Wirth

It is "well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). To establish personal involvement a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference

---

that may not represent a complete set. This is especially true given that Plaintiff has not had an opportunity to conduct discovery and prepare and present evidence. *See id.* at 69-70 (discussing circumstances where prejudice to a party forecloses a court from revisiting a prior ruling under the doctrine).

>to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (citations, italics and quotation marks omitted).

Here, Defendant Nurses Hamm and Wirth are parties to this action who appear in the case caption of the SAC but do not appear at all in the SAC's factual allegations. *See generally* ECF No. 69. Plaintiff was advised in the Court's August 12, 2021 Decision and Order "that a second amended complaint will completely replace his original Complaint and the Amended Complaint because it will 'render[] [any prior complaint] of no legal effect.'" ECF No. 63 at 13 (quoting *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977)). Accordingly, Plaintiff's claims against Nurses Hamm and Wirth are DISMISSED. *See Ward v. Coley*, No. 18-CV-2382, 2019 WL 977887, at *4-5 (S.D.N.Y. Feb. 28, 2019); *see also King v. Falco*, No. 16-CV-6315, 2018 WL 6510809, at *7 (S.D.N.Y. Dec. 11, 2018) (holding personal involvement not established where the "plaintiff includes [the defendant's] name in the case caption but fails to make any substantive allegations against [the defendant] in the body of the complaint").

The Court turns next to whether Plaintiff has adequately stated a claim for deliberate indifference as to the remaining Defendants.

### C. Defendants Fletcher, Griffen, Smith, Scott, Houri, and Holden

Plaintiff brings a claim of deliberate indifference against the remaining Defendants, pursuant to 42 U.S.C. § 1983. To adequately state a claim of inadequate health care which rises to the level of a constitutional violation, the facts alleged must show that the Defendants were deliberately indifferent to Plaintiff's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104-105 (1976). "[W]hether . . . manifested by prison doctors [or prison nurses] in their response to prisoner's needs . . . deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Id.* A claim of deliberate indifference has both objective and subjective

13

standards.  "A condition is objectively serious if it pose[s] an unreasonable risk of serious damage to [a prisoner's] future health." *Guilbert v. Sennet*, 235 F. App'x 823, 826 (2d Cir. 2007) (summary order) (internal quotation marks omitted).  Subjectively, a plaintiff must establish that the prison official "acted with the requisite state of mind, the equivalent of criminal recklessness." *Montalvo v. Lamy*, 139 F. Supp. 3d 597, 606 (W.D.N.Y. 2015) (internal quotations omitted).  "Deliberate indifference may be inferred where a risk to a [plaintiff's] health is so obvious that the defendant must have known of it, yet did not provide appropriate treatment." *Id.* at 607.

It is well-established that disagreement with a course of treatment, or even a claim that negligence or medical malpractice occurred, does not provide a basis for an Eighth Amendment violation.  *Estelle*, 429 U.S. at 105-06; *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y. 1992), *aff'd*, 970 F.2d 896 (2d Cir. 1992), *cert. denied*, 506 U.S. 1040 (1992).  Thus, because decisions regarding techniques and treatments are matters best left to medical personnel, prison medical personnel are vested with broad discretion in making such decisions.  *See Bost v. Bockelmann*, No. 9:04-CV-0246 (GLS/DEP), 2007 WL 527320, at *10 (N.D.N.Y. Feb. 20, 2007).

1. **Objective Element**

"[W]hen medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over sufficient time, the alleged deprivation of care can no longer be characterized as a 'delayed treatment,' but may instead properly be viewed as a 'refusal' to provide medical treatment." *Wesley v. O'Connor-Ryerson*, No. 9:08-CV-0953, 2011 WL 6103031, at *7 (N.D.N.Y. Oct. 27, 2011) (citing *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir.2003)).

"Since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the circumstances." *Id.*  "Relevant factors

14

informing this determination include whether the plaintiff suffers from an injury or condition that a 'reasonable doctor or patient would find important and worthy of comment or treatment,' a condition that 'significantly affects' a prisoner's daily activities, or 'the existence of chronic and substantial pain.'" *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

The gravamen of Plaintiff's SAC is that the failure of the Defendants to timely and properly diagnose his ketoacidosis led to his hospitalization and emergency surgeries. This satisfies the objective element of the deliberate indifference test. *See Beatty v. Davidson*, 713 F. Supp. 2d 167, 172, 174 (W.D.N.Y. 2010) (finding diabetic ketoacidosis "is a sufficiently serious medical condition to meet the objective prong."); *Wesley*, 2011 WL 6103031, at *8 (finding an alleged "failure of prison officials to properly diagnose [plaintiff's] diabetic ketoacidosis and pancreatitis, which led to his hospitalization . . . satisfies the objective prong of the deliberate indifference test.").

**2. Subjective Element**

The Court understands Plaintiff's theory to be that from on or about June 10 or June 14, 2017 through June 24, 2017 (the date Plaintiff was transported to the hospital via ambulance), he presented with, and described to Defendants, symptoms that the Defendants should have recognized as stemming from diabetic ketoacidosis, and/or peritonitis, and/or portal venous gas, and/or pneumobilia. Furthermore, his theory goes, Defendants failed to properly treat these conditions.

Plaintiff's allegations establish that Dr. Fletcher was aware of his condition and symptomology. On June 10 or June 14, 2017, Plaintiff informed Nurse Rush "of his weakness" and that "[he] really needed to see [a doctor]," and she phoned Dr. Fletcher. ECF No. 69 at 1. Though the degree of detail with which Nurse Rush reported Plaintiff's symptoms to Dr. Fletcher

15

is unclear, drawing all reasonable inferences in Plaintiff's favor, the SAC plausibly alleges that she presented Dr. Fletcher with an accurate picture of Plaintiff's condition as he alleges it to have been. In response to Nurse Rush's report about Plaintiff's condition, Dr. Fletcher responded "if the Plaintiff is not bleeding and not dying . . . he [will] be fine." *Id.* That same day, on the evening medical pass, Nurse Smith reported to Plaintiff that she, too, had been told by Dr. Fletcher that "if [Plaintiff] was not bleeding or dying . . . [he] would be good." *Id.*

The next day, Plaintiff was in extreme pain, could not eat or drink, was dizzy and nauseous, was having difficulty breathing, was dehydrated, and had blurry vision. *Id.* at 2. He complained to Nurses Scott and Lewis about his condition and told them he "felt like he was dying." *Id.* Nurses Scott and Lewis each reported back to Plaintiff that Dr. Fletcher did not want to see him and "there was nothing they could do." *Id.* Drawing all reasonable inferences in Plaintiff's favor, it is plausible that Nurses Scott and Lewis had conferred with Dr. Fletcher regarding Plaintiff's condition—the same way Nurses Rush and Smith did on the previous day—and were conveying his message to Plaintiff that Plaintiff would not be seen. *Id.*

Over the days that followed, Plaintiff's condition progressed to the point that he was "unable to walk, eat, drink, [or] stand," and could "barly [sic] talk." *Id.* at 4. At one point, Plaintiff laid on his cell floor "for three days" in his own vomit, urine, and feces. *Id.* He was treated by Nurses Griffen, Smith, Scott, Houri, and Holden while he languished in his cell "dying slowly." *Id.* at 6. Despite Plaintiff's condition, and despite Plaintiff "begg[ing]" to see a doctor, he was not seen by Dr. Fletcher until days into his ordeal when he refused to "lock in" the evening of June 21, 2017. *Id.* at 8.

Accepting these allegations as true, and drawing all reasonable inferences in Plaintiff's favor, the alleged conduct of Nurses Griffen, Smith, Scott, Houri, and Holden (*i.e.*, witnessing

16

firsthand Plaintiff unable to walk, eat drink, or stand, barely able to talk, and covered in his own vomit, urine, and feces on his cell floor over the course of several days, but failing to call an "inside doctor" or emergency services) betrays a sufficiently culpable state of mind at the pleading stage to cross the threshold from mere negligence to "a failure to act . . . that evinces a conscious disregard of a substantial risk of serious harm." *Mora v. Hughes*, No. 6:15-CV-06038, 2019 WL 2501882, at *9 (W.D.N.Y. June 17, 2019). Thus, the Court finds it reasonable to infer that Nurses Griffen, Smith, Scott, Houri, and Holden "saw that the [P]laintiff's medical need was urgent, and . . . deliberately ignored that need for an unreasonable period of time." *See Morgan v. Cnty. of Nassau*, 720 F. Supp. 2d 229, 239 (E.D.N.Y. 2010).

The Court also finds that the alleged conduct of Doctor Fletcher (*i.e.*, being made aware of the severity of Plaintiff's symptoms and condition on several occasions but refusing to treat him for a period of somewhere between four and eleven days while he deteriorated), also "evinces a conscious disregard of a substantial risk of serious harm." *Mora*, 2019 WL 2501882, at *9; *c.f. Wesley*, 2011 6103031, at *10 ("In light of the lack of evidence in the record suggesting defendant [doctor's] awareness of symptoms consistent with diabetic ketoacidosis and failure to provide medical attention, plaintiff has failed to satisfy the subjective prong of the deliberate indifference test as to this claim as well.").

In addition, when Dr. Fletcher examined Plaintiff on June 22, 2017, Plaintiff could not move or stand, "could not keep food or liquid down," "could not make it to the bathroom," and had "used the bathroom on him self [sic] for three days." ECF No. 69 at 8. Despite Dr. Fletcher examining Plaintiff while he was in this condition, and Plaintiff begg[ing] him to go to the hospital, Plaintiff continued to lie on the floor of his cell into the following day, June 23, 2017. *Id.* at 9.

These allegations provide further support for the fact that Plaintiff has sufficiently stated a claim for deliberate indifference against Dr. Fletcher.

Moreover, Dr. Fletcher's callous response when nurses reported Plaintiff's complaints that "if [he] [is] not bleeding or dying . . . he [will] be fine," accepted as true, provides further undergirds the Court's conclusion that Plaintiff has sufficiently alleged the subjective element as to Dr. Fletcher at the pleading stage, insofar as it reflects Dr. Fletcher's callous attitude towards Plaintiff's medical needs from the outset of these events.

**III.    State Claims**

Defendants argue that Plaintiff fails to sufficiently plead any state law claim, and that even if he did, the Court should decline to exercise supplemental jurisdiction over such claims. ECF No. 76-6 at 28. Plaintiff does not explicitly allege any state law claims in the SAC, nor does he assert in his briefing that he intends to raise such claims. *See* ECF No. 69; ECF No. 81. Moreover, this Court's prior screening orders, ECF Nos. 6, 14, and prior decisions on Plaintiff's initial Complaint and FAC, ECF Nos. 50, 63, did not interpret those pleadings as raising state law claims and Plaintiff was instructed in the Court's August 12, 2021 Decision and Order "not to add any new claims." ECF No. 63 at 13. Accordingly, Defendants request as to state law claims is DENIED AS MOOT.

**IV.    Request to Add Additional Defendant**

Finally, the Court addresses Plaintiff's request to add Correct Care Solutions as a Defendant "[b]ecause they are the company that employ the workers for the Monroe County Jail." ECF No. 69 at 3, 6.

An amended complaint adding defendant relates back to the date of an original complaint when:

> (1) the claim arises out of the same conduct originally pleaded; (2) the party to be added by amendment, within 120 days of the original filing date, has received notice of the action such that the party will not be prejudiced in defending the case on the merits; and (3) the party to be added by amendment 'knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party

*Maccharulo v. Gold*, 643 F. Supp. 2d 587, 594 (S.D.N.Y. 2009).  Here, while the claim against Correct Care Solutions likely arise out of the same conduct originally pleaded, Plaintiff does not articulate any theory of liability on which he seeks to hold this entity accountable.  Nor does he offer any explanation for his failure to add this entity as a Defendant at any earlier point in time during the four-year pendency of this litigation and the Court will not assume that it was due to "mistake concerning the identity of the proper party."

Moreover, as stated above, Plaintiff was instructed "not to add any new claims" when granted leave to file the SAC.  *See* ECF No. 63 at 13.  For these reasons, Plaintiff's request to add Correct Care Solutions as a Defendant in this action is DENIED.

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss Plaintiff's SAC, ECF No. 76, is GRANTED IN PART and DENIED IN PART.  The Clerk of Court is directed to terminate Defendant Hamm and Defendant Wirth from this action.  The remaining defendants shall file their answers no later than 21 days after the date of this Decision and Order.

The Court previously denied without prejudice Plaintiff's motions for appointment of counsel on November 29, 2018 and December 13, 2019.  ECF No. 9; ECF No. 44.  With this case now headed to discovery, should Plaintiff wish to do so, he may renew his motion for counsel once this matter has been referred to a United States Magistrate Judge.

IT IS SO ORDERED.

Dated: August 15, 2022
      Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York